IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

ROBERT E. TARDIF, JR. AS TRUSTEE FOR JASON YERK,

Plaintiff,

v.

PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, a Virginia not-for-profit corporation,

Defendant.

Case No. 2:09-cv-00537-JES-SPC

**DEFENDANT'S RENEWED RULE 50 MOTION**
**FOR JUDGMENT AS A MATTER OF LAW**

## I. INTRODUCTION

Defendant People for the Ethical Treatment of Animals (PeTA or Defendant) hereby files its renewed motion for judgment as a matter of law and moves for a judgment as a matter of law under Fed. R. Civ. Pro. 50(b). Several independent grounds exist for granting PeTA's motion. However, all derive from the incontrovertible fact that Jason Yerk committed the crime of perjury by lying under oath "in an official proceeding, in regard to [a] material matter," in violation of Florida Statutes Section 837.02(2) ("Whoever makes a false statement, which he or she does not believe to be true, under oath in an official proceeding, in regard to any material matter, commits a felony of the second degree"). Thus, Defendant states as follows:

1. First, Florida's "Wrongful Conduct" doctrine prohibits a plaintiff from profiting from his wrongful or illegal conduct. The uncontradicted evidence at trial showed that Yerk lied under oath in an official statutory investigative proceeding as to a material

matter. Plaintiff is barred from recovery since his cause of action is founded on his own illegal conduct.

2. Second, there is no legally sufficient evidentiary basis to support the jury's finding that PeTA's conduct proximately caused Yerk's injuries – Yerk's illegal conduct was not reasonably foreseeable to PeTA. As such, it constitutes an intervening and superseding factor absolving PeTA from breach of contract liability as a matter of law.

3. Third (alternatively), in the event the Court finds that Plaintiff has met his burden of proving that PeTA reasonably foresaw that Yerk would commit the crime of perjury if PeTA agreed to keep his identity as a source of information confidential, then the parties' agreement is void as a matter of law – since contracts that contemplate or help perpetuate illegal conduct are unenforceable as against public policy. Plaintiff cannot have it both ways. If Yerk's perjury was not foreseeable, there is a clear intervening cause. If Yerk's perjury was foreseeable, then it was a contract to cover up or aid and abet perjury. That the contract was void is particularly so here because the agreement was an alleged confidentiality agreement which (a) as a matter of Florida law and public policy could not interfere with discovery by third parties, (b) which here was in the context of a statutory investigative proceeding where PeTA's report was protected by constitutional First Amendment rights, and (c) where enforcement is in violation of the fundamental principle that every citizen has a duty to provide truthful information in aid of law enforcement.

4. Fourth (alternatively), if the agreement would give way to lawful procedures which could compel disclosure of the source's identity as earlier held by the Court (Doc. 179 at 14), then it was required to give way when Yerk was compelled to testify under

oath on November 19, 2008. All of the damages awarded occurred after that time. That was also the time that Lee County Sheriff's Office (LCSO) could obtain the information by proper means and no damage can be claimed thereafter.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### Wrongful Conduct

1. In June 2011, PeTA filed a Motion for Summary Judgment which sought dismissal of plaintiff's case, *inter alia*, based on estoppel, for Yerk's wrongful untruthful conduct. PeTA principally relied on the case of *Kaminer v. Eckerd Corp. of Florida, Inc.*, 966 So.2d 452 (Fla. 4th DCA 2007) (Doc. 135, pp. 8-10.)

2. On November 4, 2011, the Court denied the foregoing portion of PeTA's Motion for Summary Judgment (Doc. 179, pp. 10-11). The Court principally ruled therein, in finding the *Kaminer* case inapplicable, that Florida Statutes §§ 837.012 and 837.02 make it illegal to make a false statement, under oath both in and not in any official proceeding "in regard to any material matter."[1]

3. There is no question that Yerk made a false statement to Internal Affairs on November 19, 2008. There is also no dispute that he was under oath. Accordingly, the first two parts of the tests cited by the Court are fully met.

4. With regard to materiality of the inquiry of Yerk as to whether he had provided information to PeTA, the Court had previously ruled it not to be material "to the

---

[1] The Court further initially ruled that "Lt. Rairden's interview of Yerk was not an 'official proceeding' . . . '" On November 14, 2011, PeTA filed a Motion for Reconsideration of the Court's November 4, 2011 Order, including with regard to the Court's finding that the Yerk interview at Internal Affairs was not an "official proceeding." In response to PeTA's Motion, the Court rendered its Opinion and Order of December 1, 2011 (Doc. 192). The Court granted the Motion for Reconsideration to the extent that it struck its prior ruling that the Internal Affairs investigation was not an official proceeding. The Court declined to otherwise change its November 14, 2011 rulings. At trial, Cpt. Rairden testified that the IA investigation was an official proceeding where untruthfulness was also a violation of Department rules (Doc. 229, pp. 176-177).

underlying case – Deputy Jelly's alleged abuse of his K-9 partner." The Court also ruled "whether Yerk spoke to PeTA does not 'concern the commission' of Deputy Jelly's alleged crime." (Doc. 179, pp. 10-11) The Court's ruling was based upon the standard applicable to motions for summary judgment.

5. However, now that the Court has heard all the evidence, the facts are uncontradicted as to the materiality issue. Capt. Rairden specifically testified at trial that the inquiry as to the informant was germane and necessary to her investigation of the allegations regarding Deputy Jelly. (*See, e.g.*, Doc. 228, p. 35.)

6. Capt. Rairden (then Lt. Rairden) is a highly experienced police officer. She worked her way up over a long, distinguished career from a cadet to commander of a district. She has served as District Detective, Lt. of Internal Affairs, and has held other distinguished positions without blemish. She is a highly experienced investigator with experience in hundreds of Internal Affairs investigations (Doc. 229 at 5-6). There was absolutely no competent, contradictory testimony to her's as to these issues. Moreover, her testimony was corroborated by Lt. Trusal. Accordingly, there is no basis to disregard her uncontradicted testimony. On a Rule 50 motion, the Court must credit "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 151 (2000). Accordingly, all the following testimony of Capt. Rairden must be credited.

a. First, the facts are very clear that the allegations about Deputy Jelly were one to one and one-half years old. Capt. Rairden testified about her concern of the age of the complaints, that it had supposedly been reported to the Sheriff's Department and not

investigated, and whether there were additional witnesses that she could follow-up on (Doc. 229, p. 213). The identity of the complainant is material any time there is a very old complaint. The first reaction is why did someone wait so long; who did the complainant talk to in the meantime; and what corroboration is there, including people with whom the complainant spoke and when he/she spoke with them.

b. Second, Capt. Rairden further testified that there was a conflict in the information provided in the PeTA complaint (that the dog had been kicked and punched three to six times and hung by his collar) and the information supplied to Lt. More by the named witnesses in the complaint (Doc. 229 at 181). Given the discrepancy, it became "very important" to determine who talked to PeTA to make sure LCSO was getting the same information and that there was not a conflict with what PeTA was told that could impact the outcome of LCSO's Jelly investigation (Doc. 229 at 191-192). That clearly was material. This conflict was corroborated by Yerk, who was the witness recorded in the notes to the so-called punching and kicking incident, but who told Lt. More, and later Capt. Rairden under oath, and who testified at trial that he merely saw some slapping. *See*, D.Ex. L (November 19, 2008 transcript of Yerk interview). It was material for Capt. Rairden to then find out from whom PeTA got the information, and its reliability to document the results if Jelly's conduct did not rise to level reported to and by PeTA. (*See, e.g.*, Doc. 228, p. 96.)

c. Third, Capt. Rairden testified that she had to determine the truthfulness of the allegations in order to evaluate their seriousness because if they could confirm the allegations to PeTA, they would have to make a determination to refer it to the Major Crimes division for criminal prosecution; without credible corroboration it would remain

an administrative investigation in Internal Affairs. (Doc. 228, pp. 117-118; Doc. 229, p. 199)

d. Fourth, Capt. Rairden testified that she believed the allegations likely stemmed from Guillermo Quintana, a deputy who had just been fired for untruthfulness and who was disgruntled with the Sheriff's Office. She further testified that if the allegations were from Quintana, they would not be believable. (Doc. 228, pp. 47-48; Doc. 229, pp. 190, 192, 259) In this respect, determination of who provided the information to PeTA is absolutely material to the Jelly investigation.

e. Fifth, Capt. Rairden testified that there was no way to judge the credibility of an anonymous report and if instead the allegations were by an active Deputy Sheriff or law enforcement officer, she would find them believable. (Doc. 228, p. 151; Doc. 229, p. 200) Since Yerk was an active Deputy Sheriff and listed as one of the witnesses in the original complaint letter, it clearly was material to ask him as well as the other deputies if he or one of them provided information to PeTA.

f. Sixth, under the Law Enforcement Officers' Bill of Rights afforded by statute to Deputy Jelly, Capt. Rairden was required to interview all identifiable witnesses before Jelly, and he was entitled to know all details of the complaint, including the name of the complainant and to review the statements. Capt. Rairden was required to make the inquiry and it was accordingly material to the investigation of Deputy Jelly. (Doc. 228, pp. 42, 44; Doc. 229, pp. 186-187)[2]

---

[2] Plaintiff unsuccessfully and improperly attempted to suggest Jelly had some special relationship with Capt. Rairden. In Yerk's deposition, he testified he had just "heard" Capt. Rairden and Deputy Jelly were friends. The most he could say in way of justification of his and his counsel's specious allegations about a special relationship between Capt. Rairden and Deputy Jelly was to state that then-Lt. Rairden and her husband were at a couple of parties that Deputy Jelly was also attending. See Doc. 136, Yerk Depo., pp. 77-

(continued)

**Causation**

7. During trial, at the conclusion of the Plaintiff's case, PeTA made a Rule 50 motion. This included numerous issues, including that Plaintiff could not recover for his own wrongful conduct (estoppel based on untruthfulness); that there was an intervening cause and the issue of Yerk perjuring himself and then resigning as part of this perjury was not foreseeable; and that the alleged contract was contrary to public policy. The Court denied all of the grounds raised in the Rule 50 motion, except as to intervening cause and took under advisement the issue of foreseeability.

8. During the trial, the Plaintiff called three witnesses from PeTA (Christina Wheeless, Kristin DeJournett Simon, and Daphna Nachminovitch). The PeTA witnesses testified that they did not foresee that Yerk was going to perjure himself or lie under oath to Internal Affairs. They had no inkling that Yerk was going to perjure himself or resign after lying under oath. Indeed, it makes no sense that PeTA would even write the letter to the LCSO if PeTA thought Yerk would go in and perjure himself. It is pure conjecture and speculation to imagine that Kristin DeJournett Simon foresaw or contemplated Yerk's perjury or resignation based on perjury.

9. During jury deliberations, the jury sent out questions clearly related to the issue of foreseeability. First, "Can you further define 'reasonable foreseeability'?", and second,

---

78. Capt. Rairden testified at trial that she and her husband would consider Deputy Jelly a friend, but the same as many other police officers. Her social contacts with Deputy Jelly over a decade of working with him as a police officer comprised: (1) a charity golf tournament with many other members of law enforcement, and (2) Deputy Jelly, who had served under her husband, was one of numerous guests at her husband's retirement dinner. (Doc. 228, pp. 8-9, 11.) Capt. Rairden testified that the only time she had ever heard an allegation that she and Deputy Jelly were having an affair came from Font (Doc. 228, p. 12). (It is important to note that the Court itself found this line of questioning irrelevant, and told Font to "either get [his] act together or sit down" (Doc. 228, pp. 12-13).)

"Does the plaintiff have to provide beyond a shadow of a doubt or prove more likely than not?" (Doc. 250, p. 3)

10. The jury later sent out another question, "Are we instructed to look at (treat) the former deputy Yerk as a former deputy or civilian at the time of the events?" (Doc. 250, p. 6) The Court did not respond to the question other than asking the jury, "I do not understand the question. Can you be more specific?" (Doc. 250, p. 9) In argument about this question from the jury, both sides and the Court treated it as relating to the duties of Yerk at the time he gave false testimony, which affect foreseeability. The Court itself stated, "It's undisputed that he was a deputy at the time of all the events." The Court also stated, "A deputy has to appear when he's told to by his commanding officer. A deputy has to tell the truth. A civilian doesn't have to appear or isn't subject to any Internal Affairs investigation." (Doc. 250, pp. 7-8) Defendant's attorney argued that a deputy, "Was required to testify truthfully when brought into Internal Affairs. So I think it makes all the difference in the world. I mean, that's what the whole case was about, is you can't expect that from a police officer who knows better." (Doc. 250, p. 7) Plaintiff's attorney argued it "has no consequence" and that "The agreement at issue, Judge, was reached at a time when [Yerk] was not on duty." (Doc, 250 at p. 7) It is clear from the questions that the jury was confused on the issue of foreseeability. Defendant's attorney asked three times that the jury be instructed that Yerk was a deputy at the time of the events. (Doc. 250, pp. 8-9)

11. The jury, in its verdict form, answered "yes" to the statement that PeTA's breach was a direct and foreseeable cause of Jason Yerk's damages. (Doc. 242, paragraph (i))

12. Subsequent to the jury verdict, the Court entered an Order on February 6, 2012 (Doc. 245) denying the reserved Rule 50 issue of foreseeability without further explanation as to foreseeability.

## III. ARGUMENT

### A. The Wrongful Conduct Rule Bars Plaintiff's Claim

#### 1. Florida's Wrongful Conduct Rule Bars A Plaintiff From Profiting From A Cause Of Action Founded On His Own Illegal Conduct

Florida follows the "the wrongful-conduct rule" that precludes a plaintiff from profiting from a cause of action founded on his own illegal, wrongful, or fraudulent conduct. *Kaminer v. Eckerd Corp. of Florida, Inc.,* 966 So.2d 452, 454 (Fla. App. 4 Dist. 2007); *Ashwood v. Patterson*, 49 So.2d 848 (Fla. 1951) ("no one shall be permitted to profit by his own fraud, or take advantage of his own wrong or found any claim upon his own iniquity, or profit by his own crime"). As the *Kaminer* court noted, if recovery were permitted in such a case, it would condone and encourage illegal conduct, effectively compensating the wrongdoer for his illegal acts. Under Florida law, this result is prohibited, since it would make a mockery of justice and would allow the plaintiff to shift the responsibility for his illegal acts to others. *See id.*

In denying Defendant's motion for summary judgment based on *Kaminer's* wrongful-conduct rule, this Court previously found that Yerk did lie under oath, but that *Kaminer* did not apply because Yerk's "untruthfulness does not constitute 'illegal' conduct." (Doc. 179, p. 10.) In particular, the Court found that the false statement must concern a "material" matter. (Doc. 179, pp. 10-11) As demonstrated below, as a matter

of law, this requirement is met. Therefore, Plaintiff's case is barred by the wrongful-conduct rule enunciated in *Kaminer.*[3]

**2. Yerk's Untruthfulness Constitutes "Illegal Conduct" Under Florida Statutes Section 837.02(2)**

Under Florida Statutes Sections 837.012 and 837.02, three elements are required to establish the crime of perjury: (1) a false statement, (2) made under oath [in or not in an official proceeding], (3) in regard to any material matter. All three elements are met in this case. First, it is undisputed that Yerk falsely testified under oath in the LCSO investigation as follows:

RAIRDEN: … Outside of the Lee County Sheriff's Office, have you spoken to anyone about these complaints or make any statements to anyone about these complaints?

YERK: No.

RAIRDEN: Okay. You never spoke to anybody, um, with PETA?

YERK: No.

(P.Ex. 20, D.Ex. L.) Yerk's lie while under oath was earlier deemed to be conclusively established by the Court (Doc. 126 at 4) and was fully admitted at trial.

[3] "Binding precedent in this Circuit [] expressly permits consideration of a Rule 50 motion after the denial of summary judgment." *Abel v. Dubberly*, 210 F.3d 1334, 1337 -1338 (C.A.11 (Ga.),2000), citing *Gross v. Southern Ry. Co.*, 446 F.2d 1057, 1060 (5th Cir.1971) ("It is settled in this Circuit, therefore, that prior denial of summary judgment does not rule out the possibility of a subsequent directed verdict."); *Gleason v. Title Guarantee Co.*, 317 F.2d 56, 58 (5th Cir.1963) ("Sound practical reasons ... may justify a trial judge's denying a motion for summary judgment even on the identical evidence supporting his granting a directed verdict."); *Stanley v. Guy Scroggins Constr. Co.,* 297 F.2d 374, 378 (5th Cir.1961) ("This holding [reversing a grant of summary judgment] does not rule out the possibility of a directed verdict. It may be, when the evidence is in, that the district judge will find that the case should be disposed of by a directed verdict. He is free to do so."). These precedents continue to be applied in the Eleventh Circuit. *Abel*, 210 F.3d at 1337 - 1338, citing *Mendoza v. Borden, Inc.*, 195 F.3d at 1241-42, 1253 (affirming the district court's granting of a Rule 50 motion following denial of a Rule 56 motion); *Walker v. NationsBank N.A.*, 53 F.3d at 1552-53, 1558 (affirming a grant of a Rule 50 motion after denial of a Rule 56 motion).

In addition, it has been recognized that the LCSO investigation constitutes an "official proceeding" within the scope of the perjury statute. See Doc. 232; *Melendres v. State*, 739 So.2d 1237 (Fla. 3d DCA 1999).

With respect to the final element, the "determination of materiality is a question of law, to be decided by the trial court." *Ramos v. State,* 444 So.2d 87, 88 (Fla.App. 3 Dist. 1984), citing *Wells v. State,* 270 So.2d 399 (Fla. 3d DCA 1972) *cert. denied,* 414 U.S. 1024, 94 S.Ct. 449, 38 L.Ed.2d 316 (1973); § 837.011(3).

The undisputed testimony at trial clearly establishes that Yerk lied about a matter that could affect the resolution of the LCSO investigation. As such, it is "material" as a matter of law, within the scope of Florida's perjury statute. *See* § 837.011(3), *Fla. Stat.* (defining "material" as any subject "which could **affect the course** or outcome of the proceeding."); *see also Soller v. State*, 666 So.2d 992, 993-995 (Fla. 5th DCA 1996) (a statement is material if it is "**collaterally or corroboratively material** to the ultimate material fact to be established" or "if it has the **mere potential to affect the resolution** of a main or secondary issue" or if it relates to the credibility of a witness).[4]

As this Court itself recognized at the pre-trial conference, if the evidence showed that there were "conflicting" stories about the alleged animal abuse, then the identification of "who provided the information" to PeTA would become material to "the ability to prosecute." The Court stated (Doc. 224-1):

> THE COURT: Well, we can argue about that, but there's a number of legal reasons why law enforcement will want to know who provided the information, because if there ever was a case, there's constitutional obligations to

[4] The Court earlier cited to *State v. Diaz*, 785 So.2d 744, 745 (Fla. 3d DCA 2001), where the court referred to materiality as "germane or material to the **inquiry** or charge," which could affect the course or outcome of the proceeding," and whether it "affect[s] any witnesses' credibility."

> provide information, including information if it was a conflicting prior story. So it was not -- it may be immaterial to whether Jelly committed the crime or not, but it's certainly not immaterial to the prosecution of the case and the ability to prosecute.

First, the uncontradicted facts at trial demonstrated that witnesses *did* provide law enforcement with stories which conflicted with the information reported by PeTA, thereby heightening the need for identification of who provided information to PeTA. Second, the difference between having an anonymous report of abuse of no credibility and one from a sworn law enforcement officer was clearly material. *See, e.g., U.S. v. Elkins*, 300 F.3d 638, 651 (6th Cir. 2002) (finding that the difference between an investigator having a known informant and an anonymous informant was "material"; "Tips from known informants have more value than those from unknown ones"). Accordingly – as confirmed by the trial testimony of Capt. Rairden – the questions to Yerk as to whether he had talked to PeTA (and was thus a credible source of complaint allegations) were a material matter to LCSO in establishing the value and credibility of the complaint information. Third, the materiality was enhanced because it was correctly suspected that the complaint stemmed from Quintana who was viewed as not credible. Fourth, the materiality was also enhanced by the age of the reported abuse and to follow-up on what had occurred regarding the incidents. Fifth, statutory procedures in § 112.532, *Fla. Stat*., provided additional materiality in regard to completing and providing interviews statements of all identifiable witnesses. And, finally, and importantly, it was highly material to determine if the PeTA report (which was not being supported) could be confirmed because, if so, the matter would be referred to Major Crimes for prosecution, affecting the entire course of proceeding.

Since the uncontradicted evidence at trial establishes that Yerk's lie concerned a "material" matter, this Court should find as a matter of law that Yerk's conduct was illegal, in violation of Florida's perjury statute. Also, and separately, it was clearly wrongful in violation of the LCSO rules and regulations for a sworn deputy to lie in an IA investigation. Plaintiff is therefore barred from recovery under the wrongful-conduct doctrine enunciated in *Kaminer*.

**B. Yerk's Injury Was Caused By An Unforeseeable Intervening Illegal Act**

There is no legally sufficient evidentiary basis to support the jury's finding of a causal link between PeTA's breach (*i.e.*, identification of Yerk) and causation of Yerk's damages. Rather, Yerk's resignation and alleged injury was caused by an unforeseeable intervening illegal act – Yerk's false testimony under oath when he denied speaking to PeTA. Construing the evidence in the light most favorable to the Plaintiff, reasonable jurors could not arrive at a contrary verdict absent pure speculation.

**1. Proximate Causation Principles Require Foreseeability Of The Event or Conduct That Caused The Injury**

"The Florida Supreme Court has summarized the relevant proximate causation principles as follows: The issue of proximate cause is generally a question of fact concerned with whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred. This Court has stated that harm is 'proximate' in a legal sense if prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question." *See Tardif v. People for Ethical Treatment of Animals,* 2011 WL 5357564, 11 (M.D.Fla. 2011). Foreseeable consequences are not what might possibly occur. *Cone v. Inter County Tel & Tel Co.*, 40 So.2d 148 (Fla. 1949). As a corollary, a defendant's

breach of contract is not the proximate cause of damages if the damages are caused by events that the defendant could not have reasonably contemplated or foreseen.

"Since a person usually has no reason to foresee the criminal acts of another, it is generally held that an intervening criminal act breaks the chain of causation." *Singer v. I. A. Durbin, Inc.*, 348 So.2d 370, 372 (Fla.App. 1977); *see also McCord v. Sentry Protection, Inc.,* 427 So.2d 1132, 1133 (Fla.App. 5 Dist., 1983) (intervening criminal act breaks the chain of causation if the defendant has no reason to foresee the criminal act). Accordingly, judgment may "be determined as a matter of law in the circumstance where, as here, the intervening act is merely possible rather than probable"; a "freakish and improbable" chain of events has been held to break the causal link between a defendant's conduct and a plaintiff's damages. *See Palma v. BP Products North America, Inc.*, 347 Fed. Appx. 526, 527 (11th Cir. 2009).

**2. Yerk's Perjury Was Not Foreseeable**

At trial, Plaintiff offered no evidence from which a reasonable jury could conclude that Kristin DeJournett Simon had a reason to foresee that a sworn law enforcement officer such as Yerk would lie under oath in connection with the Internal Affairs inquiry and then resign. On November 13, 2008, Kristin DeJournett Simon sent an email (D.Ex. J) stating it was understood that the officers "will willingly speak should an internal investigation be initiated." That is anathema to any speculation that she foresaw or could foresee that Yerk would perjury himself. His name was properly released in the November 4, 2008 letter as a witness and she knew he would be interviewed and has stated she understood he would "willingly speak". By any standard, a sworn law enforcement officer who lies under oath is "freakish and improbable," and PeTA should not be held to a standard that would require it to foresee such an illegal circumstance. The

evidence was overwhelming that rules against lying at LCSO were well known. It was undisputed that Yerk did not tell PeTA he would lie and indeed Yerk claimed he was "surprised" to be asked the question to which he lied. Therefore, Yerk's criminal act was an independent intervening cause that was not within the realm of reasonable foreseeability on the part of PeTA – and as such broke the chain of causation, relieving PeTA of liability for Yerk's injuries. *See Roberts v. Shop & Go, Inc.*, 502 So.2d 915, 917 (Fla.App. 2 Dist. 1986).

Here, the jury was obviously confused on this issue as demonstrated by their last question as to whether Yerk should be treated as a deputy or civilian at the time of the event. Plaintiff argued to the Court and the jury about people denying making a complaint to their employer with concern about disciplinary action (see Doc. 249 at 4) not in the context of an IA investigation, which the Court found non-responsive to the foreseeability issue. (Doc. 249 at 6) As the Court stated, it was undisputed that Yerk was and should be treated as a deputy, that a deputy has to appear as directed and tell the truth, and a civilian does not. (Doc. 250 at pp. 7-8) However, the matter was never clarified to the jury because Plaintiff objected. It was the foreseeability of the specific chain of events regarding Yerk's lie under oath as a deputy in an LCSO IA investigation that was in issue. As stated in *Palma*, in issue is the foreseeability of the chain of events that occurred and an injury caused by an "improbable chain of events would not be 'proximate' precisely because it was unquestionably unforeseeable." Here, where Plaintiff admits he did not foresee being asked if he called PeTA, PeTA certainly could not have foreseen he would lie if asked.

**C. The Confidentiality Agreement Is Unenforceable As Against Public Policy**

There are, of course, matters about which parties are incapable of contracting -- such as where the contract contemplates illegal behavior or interference with discovery rights. *See, e.g., State v. Gordon,* 920 So.2d 42, 43 (Fla.App. 1 Dist. 2005) (parties are incapable as a matter of law of entering into a "contract" to buy illegal substances). In the event that the Court finds that a reasonable jury could conclude that PeTA did foresee that Yerk would commit perjury if PeTA agreed to keep his name confidential, then the agreement is unenforceable as against public policy.

Contracts that contemplate, agree to cover up, or abet perjury on the part of one of the contracting parties are, on their face, unenforceable as a matter of law. As the United States Supreme Court explained over a century ago, "it would be strange indeed if a court of equity lent its aid to enforce the performance of a contract founded upon perjury, and entered into in defiance of a clearly expressed will of the government. . . . it is so clearly against the will and policy of the government, and so necessarily resting upon perjury, that a court of equity will have nothing to do with it." *Anderson v. Carkins,* 135 U.S. 483, 489, 10 S.Ct. 905, 906 (U.S. 1890). Similarly, in *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 819, 65 S.Ct. 993, 999 (U.S. 1945), the United States Supreme Court noted that " where, as here, the [parties' agreement] is grounded upon knowledge or reasonable belief of perjury . . . [it] lacks that equitable nature which entitles it to be enforced and protected in a court of equity."

The result is further required under Florida law, which deems confidentiality agreements unenforceable to the extent that they would preclude discovery of the truth by law enforcement in an official investigation or even by private parties in civil litigation, because such agreements are contrary to strong public policy. *See Nestor v. Posner-*

*Gerstenhaber*, 857 So.2d 953, 955 (Fla. 3d DCA 2003) ("Contractual confidentiality agreements, however, cannot be used to adversely interfere with the ability of nonparties to pursue discovery in support of their case"); *Scott v. Nelson*, 697 So.2d 1300, 1301 (Fla. 1st DCA 1997) (confidentiality agreements "which suppress evidence violate the greater public policy"); *Neiman v. Naseer*, 47 So.3d 954, 955 (Fla. 4th DCA 2010) ("confidentiality agreements . . . may not be subsequently employed by a litigant to . . . thwart an opponent's discovery"); *Smith v. TIB Bank of the Keys*, 687 So.2d 895 (Fla. 3d DCA 1997) (same); *City of Homestead v. Rogers*, 789 So.2d 483 (Fla. 3d DCA 2001) (same); *Gutter v. E.I. DuPont de Nemours & Co.*, 2001 U.S. Dist. LEXIS 9706, *5 (S.D. Fla. 2001) ("Citing public policy concerns, a number of courts have held that such confidentiality provisions will not be utilized as a shield to obstruct the discovery process").

For example, in *Nestor*, the court affirmed the nullification of formal written confidentiality agreements to the extent they barred "informal" interviews of witnesses who signed confidentiality agreements by grandchildren investigating grounds to contest a will. This was based upon the public policy of Florida that confidentiality agreements "cannot be used to adversely interfere with the ability of nonparties to pursue discovery." *Id.* at 955. The court in *Nestor* specifically rejected the argument that a party to a confidentiality agreement "only be allowed to disclose information at a formal deposition or at trial," holding that there was "no need to make the [investigating party] jump through legal hoops to obtain information" or "undergo unnecessary and costly discovery procedures." *Id.*

Applying these principles to the facts of this case, a confidentiality agreement entered into to preclude discovery of information and Yerk's lie in official proceedings by LCSO Internal Affairs to verify an abuse complaint against a deputy is void. Indeed, the public policy limitation on confidentiality agreements is much greater as applied to a deputy in comparison to a private citizen and to providing information to the police about a crime. *See Camp v. Eichelkraut*, 246 Ga. App. 275, 286 (Ga. App. 2000) (since public policy does not permit confidentiality agreements to keep discoverable matters secret in litigation, "then with **greater force**, that public policy does not permit parties to enter into an enforceable agreement to keep arguably criminal matters secret in the face of an official investigation"; voluntary provision of information upon questioning by police must be permitted and is legally implied to avoid running afoul of public policy).[5]

Further, it is undisputed that when PeTA's complaint was referred to IA on November 13, 2008, LCSO had instituted an official IA proceeding under § 112.533, Fla. Stat., and PeTA's provision of Yerk's name as a source of information occurred during this official proceeding. PeTA was absolutely privileged under the First Amendment to provide this information in that § 112.533 proceeding. *Gray v. Rodriguez*, 481 So.2d 1298 (Fla. 3d DCA 1986). As discussed in *Gray*, PeTA was exercising its First Amendment right under the U.S. Constitution and Florida Constitution to petition the government to redress grievances which "is protected without fear of suit" because "[o]therwise, there would be not only a chilling effect on citizens' complaints but a freezing over." This Constitutional right further enhances the determination that there was

[5] Where, as here, the agreement is void for violation of public policy, all claims and counts based on the illegal agreement are dismissed. *Katz v. Woltin*, 765 So.2d 279 (Fla. 4th DCA 2000) (dismissing contract, fraud, and breach of fiduciary duty claims).

no enforceable confidentiality agreement. In addition, it is a fundamental principle that the public has a right to every man's evidence and that every citizen owes a duty to provide truthful information in aid of law enforcement. *Piemonte v. U.S.*, 367 U.S. 556 (1961). This adds yet an additional support that the alleged agreement cannot be enforced in derogation of the predominant public interest of searching for the truth.

Finally, the Court has held that the alleged confidentiality agreement "could not create an absolute privilege, and would eventually give way to lawful procedures which could compel disclosure of the source's identity" (Doc. 179 at 14). It is undisputed on the evidence that Yerk was immediately scheduled for and compelled to testify under oath and provide truthful information in his first LCSO interview on November 19, 2008, in the official statutory proceeding under § 112.533, *Fla. Stat*. A confidentiality agreement was unenforceable in that formal proceeding and as to Yerk's compelled testimony regarding whether he was a source of information to PeTA. Yerk alleges no loss or injury prior to that time and the jury award was for alleged damages occurring thereafter. Indeed, the evidence at trial further shows that PeTA's reference to Yerk as a caller was not believed at LCSO. The alleged agreement gave way to LCSO's lawful procedure to compel the information on November 19, 2008. As Capt. Rairden testified, if Yerk had done so, he would still be employed at LCSO (Doc. 229, p.231). The alleged contract gave way to those procedures and Yerk cannot recover for violating the procedures by lying and then resigning and the entire jury award must be set aside and judgment entered in favor of Defendant.[6]

[6] The same result obtains under the damage principle that Plaintiff cannot claim any damage or loss once LCSO could obtain the information by proper means. *The Medical Store v. AIG Claim Servs.*, 2003 U.S. Dist. LEXIS 27554 (S.D. Fla. 2003).

## IV. CONCLUSION

For all of the foregoing reasons, Defendant respectfully requests that this motion be granted and that a judgment as a matter of law be entered in favor of Defendant.

**LOCAL RULE 3.01(g) CERTIFICATE**

Defendant certifies that defense counsel conferred with Plaintiff's counsel regarding its renewal of its motion for a judgment as a matter of law in favor of Defendant dismissing Plaintiff's action and counsel were unable to agree on resolution.

Respectfully submitted,

By: s/ Robert D. Hall, Jr.

Robert D. Hall, Jr.
Florida Bar No. 186760
rhall@fordharrison.com
FORD & HARRISON LLP
101 E. Kennedy Boulevard, Suite 900
Tampa, Florida 33602
Telephone: (813) 261-7800
Facsimile: (813) 261-7899

Patricia G. Griffith
Georgia Bar No. 311928
pgriffith@fordharrison.com
FORD & HARRISON LLP
271 – 17th Street, N.W., Suite 1900
Atlanta, Georgia 30363
Telephone: (404) 888-3800
Facsimile: (404) 888-3863

Philip J. Hirschkop
Virginia Bar No. 04929
pjhirschkop@aol.com
HIRSCHKOP & ASSOCIATES, P.C.
1101 King Street, Suite 610
Alexandria, Virginia 22314
Telephone: (703) 836-5555
Facsimile: (703) 548-3181

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on March 5, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to Jose Font/Evan A. Zuckerman /Carl Bober, Vernis & Bowling of Broward, P.A., 5821 Hollywood Blvd., First Floor, Hollywood , Florida 33021

s/ Robert D. Hall, Jr.
Attorney