UNITED STATES DISTRICT COURT
for the
MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| ROBERT E. TARDIF, JR. as trustee for the bankruptcy estate of JASON YERK<br><br>Plaintiff,<br><br>v.<br><br>PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, a Virginia not-for-profit corporation<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No.: 2:09-cv-00537-JES-SPC<br>)<br>)<br>)<br>) |

**PLAINTIFF'S RESPONSE TO THE DEFENDANT'S RENEWED RULE 50 MOTION FOR JUDGMENT AS A MATTER OF LAW**

COMES NOW, ROBERT E. TARDIF, JR. as trustee for the bankruptcy estate of JASON YERK, by and through the undersigned counsel and hereby files this response to the Defendant's Renewed Rule 50 Motion for Judgment as a Matter of Law, stating as follows.

*Background*

1. In October 2008, the Plaintiff, Jason Yerk, was solicited by the Defendant, People for the Ethical Treatment of Animals ("PeTA"), to provide information regarding an incident that he witnessed which gave rise to the suspicion that Deputy Travis Jelly, a fellow K-9 officer at Lee County Sheriff's Office (LCSO), was abusing his canine.

2. Based on a promise that he would remain anonymous as a witness that had provided information to PETA regarding the incident, Yerk agreed to provide PeTA a witness account.

3. Shortly after Yerk provided a statement to PeTA, it breached the confidentiality agreement and disclosed Yerk's identity to the LCSO as a person who had reported suspected abuse by a fellow K-9 officer.

4. As a direct result of PeTA's breach of the confidentiality agreement, Yerk was left with no alternative other to resign from LCSO.

5. The Defendant filed a motion for summary judgment on June 19, 2011 (Doc. 135) which asserted that the Plaintiff's claim should be barred based on "(1) Yerk's own untruthful illegal conduct, (2) Yerk's own voluntary resignation [and] (3) an unenforceable confidentiality agreement in violation of public policy . . ." *Id*. at pg. 2.  Plaintiff's response to the Defendant's Motion for Summary Judgment was filed on July 5, 2011.

6. By way of a 31 page order dated November 4, 2011, this Court denied the Defendant's motion.

7. On February 7, 2012, following the jury trial of this matter and the Defendant's presentation of numerous dispositive motions, the Court entered judgment in favor of the Plaintiff on the count pertaining to breach of contract. *See* Doc. 246.

8. Thereafter, the Defendant filed the instant motion (Doc. 255) seeking to have the Court enter judgment notwithstanding the verdict on one of a number of grounds.

9. These grounds were adjudicated adversely to the Defendant in this Court's detailed order denying its Motion for Summary Judgment, an order denying a motion for rehearing as it related to said motion and a Rule 50 motion at trial. Furthermore, the evidence elicited at trial concretely establishes the basis for the jury's verdict and the Court's legal rulings, as a result the judgment in this case should stand.

**Memorandum of Law and Argument**

I. *Standard of Law Applicable to Rule 50 Motions*

10. "The standard for granting a renewed motion for judgment as a matter of law under Rule 50(b) is precisely the same as the standard for granting the pre-submission motion under 50(a)" *Marlite, Inc. v. Eckenrod*, 2011 WL 39130 (S.D. Fla. 2011) *aff'd sub nom. Marlite, Inc. v. Am. Canas*, 2012 WL 254584 (11th Cir. 2012) (internal citations omitted).

11. "Thus, under both Rule 50(a) and 50(b), a moving party has a heavy burden to meet. The standard of review for a district court to grant the motion is whether, when the facts and inferences are viewed in the light most favorable to the opposing party, they point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict." *Id*. (internal citations omitted).

12. "To that end, we note that it is not the function of the Court to make credibility or factual determinations under the guise of a Rule 50 review. If there are conflicting inferences that can be drawn from that evidence, it is not the Court's role to pick the better one. Instead, all reasonable inferences from the evidence must be drawn in [the non-moving party's] favor." *Marlite*, 2011 WL 39130 (S.D. Fla. 2011) (internal citations omitted).

13. As noted previously, it is important to emphasize that this Court denied the Defendant's Rule 50(a) motion which raised the same factual and legal issues that are raised in the instant motion. Considering this adjudication was had within days of considering the testimony and evidence at issue first hand, there is simply no additional evidence or changed law that necessitates this Court's reconsideration.

14. The Defendant states in its Rule 50(b) motion that "several independent grounds exist for granting PeTA's motion. . . . [which] all derive from the incontrovertible fact that Jason Yerk committed the crime of perjury by lying under oath 'in an official proceeding, in regard to [a] material matter,' in violation of Florida Statutes Section 837.02(2)." Doc. 255 at pg. 1. This citation was later corrected to read Fla. Stat. § 837.02(1). *See* Doc. 256.

15. Florida Statute 837.02(1) states in pertinent part as follows:

> [W]hoever makes a false statement, which he or she does not believe to be true, under oath in an official proceeding in regard to any material matter, commits a felony of the third degree . . .

16. In its misguided attempts to prove that Mr. Yerk's statements violated this statute, the Defendant has tried to show that the alleged misrepresentation was "material" to the LCSO's internal investigation of Deputy Jelly's animal abuse. *See, e.g.*, Doc. 255 at pgs. 3-4.

17. The Court, in its prior ruling on this issue, held that the misrepresentation was not material, stating that "[w]hether Yerk spoke to PETA was not 'material' to the underlying case – Deputy Jelly's alleged abuse of his K-9 partner." Doc. 179 at pgs. 10-11.

18. The Defendant attempts to entice the Court to reconsider its prior ruling on the basis that "uncontradicted" testimony offered into evidence by Capt. Kathryn Rairden have proved the materiality of Mr. Yerk's alleged misrepresentation to the LCSO investigation. Specifically, reference is made to several subjective conclusions made by Captain Rairden.

19. Captain Rairden's subjective beliefs should have no impact on this Court since the issue of materiality is a question of law for the Court, not Captain Rairden.

20. The Defendant cites to *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000) for the proposition that "[o]n a Rule 50 motion, the Court must credit 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses." Doc. 255 at pg. 4. As such, the Defendant states that "all the . . . testimony of Capt. Rairden must be credited." *Id*. The Defendant fails to note that *Reeves* also states that "the court . . . <u>must</u> disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151 (emphasis added).

21. It would defy basic perception to suggest that Capt. Rairden was a "disinterested witness" since during the course of trial testimony it was readily evident that she was biased, sought to protect her own interests and was otherwise intent on being less than forthright for the purpose of establishing legitimacy to her illegitimate course of action.

22. More specifically, during the course of trial, her testimony established: the pretextual nature of the Jelly investigation; the inherent conflict of interest that existed in her investigation in light of the fact that she was investigating Deputy Jelly, a long time friend of her and her husband; the fact that the department had a compelling motivation to retaliate against Yerk since it was admittedly a public relations nightmare to have PETA protestors at their work place; upper level management was upset by the existence of the pending complaint, and thus Yerk, since they knew him to be the informant from the onset of the investigation; her concession that she did not comply with Law Enforcement Officers' Bill of Rights (Fla. Stat. §§ 112.532-534) in interacting with Yerk by not providing him an opportunity to utilize retained counsel, receive notice of the subject of the investigation, receive copies of his statements that had been obtained from

PETA, etc.; her admission that she could be the subject of a disciplinary action in light of the fact that she did not afford Yerk the required due process under the Law Enforcement Officers' Bill of Rights; and her belief that the complaint against Deputy Jelly was frivolous since it had been initiated by Guillermo Quintana, a person that she deemed to be a "disgruntled employee" that lacked credibility. As the jury was not bound to believe or accept any of Captain Rairden's testimony (and based on their verdict explicitly failed to do so), that testimony *must* be disregarded when adjudicating this motion as a matter of law.

23. When this testimony is disregarded as required by binding precedent cited by the Defendant, there is simply no stated grounds for why this Court should reconsider its prior rulings.

24. In terms of the putative materiality of Yerk's identity and the pretextual nature of Captain Rairden's supposed investigation of Deputy Jelly which rendered it a sham, it is important to take a close look at the steps taken by Captain Rairden during the first seven days of her investigation.

25. LCSO received a written complaint from PETA on November 4, 2008, wherein Kristen DeJournett, a PETA employee, described the incidents of suspected animal abuse as had been set forth by Quintana and Yerk. *See* Plaintiff's Trial Exhibit #4. Per the confidentiality/anonymity agreement that had been provided to Quintana and Yerk, DeJournett did not disclose the source of the described incidents of animal abuse and indicated that she could not because **"our callers have asked to remain anonymous for fear of reprisal."** *Id*. That said, the letter went on to state that the callers would participate in the IA investigation against PETA and listed Deputies Craven, Yerk,

Bonsall and Grossi as persons at LCSO with knowledge regarding the suspected animal abuse. *See Id*.

26. Upon receipt of the complaint from PeTA, LCSO directed IA investigator Lt. Kathy Rairden to conduct an internal affairs investigation of Deputy Jelly's alleged abuse of his K-9 dog. *See* Plaintiff's Trial Exhibit #14.

27. Lt. Rairden's investigation began on November 13, 2008 when she spoke with DeJournett (located in Virginia) over the phone. *See Id*. During the course of this phone call DeJournett told Rairden that Yerk was the unidentified deputy who provided information to PETA about Jelly's suspected animal abuse. *See Id*. Lt. Rairden testified in this case that DeJournett admitted to her verbally that the disclosure was a "mistake" and a violation of PETA's confidentiality agreement with Yerk. *See Id*. That same day, DeJournett sent Lt. Rairden an e-mail wherein she states "here are our coordinator's notes regarding the K9 abuse complaints. 'Comp' is short for complainant. <u>Due to our confidentiality agreement</u>, the name of the deputy in the second paragraph had to be redacted (referring to Yerk)." (emphasis added). *See* Plaintiff's Trial Exhibit # 7.

28. Notwithstanding the fact that Lt. Rairden was verbally put on notice at the very onset of her investigation that Yerk had contacted PETA and was the initiator of the investigation, due to the admitted alliance and friendship she had with Deputy Jelly, she initiated an illegitimate investigation that was guided to ousting Yerk as the proverbial "rat," as opposed to her official assignment of investigating whether Jelly was abusing his K-9.

29. This conclusion is supported by the fact that shortly after DeJournett had "mistakenly" disclosed Yerk's identity over the phone on November 13, 2008 as the person that had called PETA to initiate the investigation, Lt. Rairden exercised exhausting efforts during

her first 7 days of the "Jelly IA investigation" to conclusively prove that Yerk had contacted PeTA to initiate the investigation. Amongst other things, these efforts consisted of the following:

a.)   Taking a recorded statement of Christina Wheeless for the sole purpose of confirming Yerk's contact with PeTA. *See* Plaintiff's Trial Exhibit #14. As a highly experienced and highly ranked investigator, Lt. Rairden knew that any hearsay statement from Christina Wheeless, who lived and worked in Virginia, would have no consequence to her investigation of Deputy Jelly. Efforts to schedule this recorded statement were made even before she had bothered to ask Yerk whether he spoke to PETA. *See Id*.

b.)   Taking the recorded statement of Kristen DeJournett to confirm Yerk's contact with PETA. *See Id*. As discussed above, Kristen DeJournett's knowledge regarding the suspected animal abuse was based on nothing more than double hearsay. Again, this fact would have no consequence of the investigation of Deputy Jelly. Efforts to schedule this recorded statement were made even before she had bothered to ask Yerk whether he spoke to PETA. *See Id*.

c.)   Sending e-mails to Kristen DeJournett requesting that Yerk's name be disclosed in writing and arguing within a November 18, 2008 e-mail "that once the deputies make a statement to you as an employee of Sheriff's Office the confidentiality should not extend to them." Plaintiff's Trial Exhibit # 8. In that same e-mail Lt. Rairden went on to   imply that the investigation against Jelly (which was 5 days old) would end if she did not cooperate with her quest of establishing unequivocal evidence that Yerk had broken the code of silence. Specifically, her e-mail stated that **"to continue with this investigation** I will need from you . . . the [witnesses'] full names . . . . **by the end of business today** as

we will be making a decision on whether or not this remains and administrative investigation or becomes a criminal investigation." *Id*. Lt. Rairden's statement that the information was needed by the end of business in order to make a determination as to how the investigation would proceed is patently false, since she had yet to interview **any** of the LCSO employees named in PETA's November 4th letter as witnesses to Deputy Jelly's suspected K-9 abuse.

d.)   Prior to Yerk's November 19th interview, Lt. Rairden demanded that PETA provide the phone number that Yerk called from so that they could match it with his department phone.

e.)   When DeJournett refused to disclose Yerk's name in writing on November 18, 2008, Lt. Rairden directed Lt. Trusal to go through Yerk's cell phone records to confirm that he had contacted PETA. This occurred one day before Lt. Rairden was scheduled to interview Yerk. *See* Plaintiff's Trial Exhibit #14.

f.)   Before interviewing Yerk, Lt. Rairden met with Captain Ferrante to verify whether Yerk had disclosed to him that he had spoken to PETA. *See Id*.

g.)   Lt. Rairden documents in her investigative report that "Ms. DeJournett stated due to confidentiality agreements the deputy's name had been redacted. *See Id*. This made no sense to me as she had already identified the deputy as Deputy Yerk." *See Id*. In her own words, it is obvious that Lt. Rairden is becoming frustrated with the fact that she cannot develop the necessary evidence that she will need to establish that Yerk initiated the investigation. This is so even though she had yet to confront Yerk with the question of whether he spoke to PETA.

30. The Defendant advances the argument that the exhaustive efforts made by Captain Rairden were based on the fact that there were conflicting statements from Yerk and that she had an obligation under the Law Enforcement Bill of Rights to provide Deputy the identity of the complainant. These arguments were shown to be without basis for a number of reasons, including but not limited to: the efforts outlined were initiated before Yerk ever gave a statement to Captain Rairden (*See Id.*); LCSO's webpage for making complaints against police officers specifically states that complaints can be anonymous; Captain Rairden testified that it is accepted practice for LCSO (as indicated on their webpage) to pursue anonymous complaints against police officers; Captain Rairden took no steps to ascertain the identity of non-employees (Guillermo Quintana and Rosemary Wilson) that she reasonably believed to have been involved in initiating the complaint and the statement provided by Yerk regarding the incident in question directly correlated with PETA's notes which identified Yerk as the complainant and the only witness to the event.

31. In response to the argument advanced by Lt. Rairden (as discussed in paragraph 6 of the Defendant's motion) that Yerk as a LCSO officer should not be entitled to any confidentiality agreement with PETA, on November 18, 2008 DeJournett sent Lt. Rairden an e-mail which stated as follows:

> Lt. Rairden,
>
> Yes.  I did receive it this time (although not the first time, so thanks for resending).  Our confidentiality agreement extends to everyone, whether they be citizen, law enforcement officer, whistleblower (sic), etc.  I'm currently working to see what other information I can get for you.  We want to help as much as we can but are not allowed to violate the confidentiality agreement.

*See* Plaintiff's Trial Exhibit # 9.

32. DeJournett testified at trial that Lt. Rairden did not take well to her e-mail and decided to utilize intimidation tactics such as threatening a subpoena. Furthermore, she stated that Lt. Rairden "scared the shit out of me" and that was why she disclosed Yerk's identity.

33. Being frightened to the point that she felt compelled to intentionally breach the confidentiality agreement between PETA and Yerk, six hours the after November 18, 2008 e-mail from Lt. Rairden (Plaintiff's Trial Exhibit #8), DeJournett sent an e-mail to Lt. Rairden which stated in pertinent part as follows:

    I've talked the issue over with my supervisors and gotten permission to release the name. It seems to me that you only need the notes again (as these are indeed all the details we have), with the deputy's name inserted, along with a couple more details . . . .

    Second Call on 10/21/08

    • Talked with Deputy Jason Yerk; he is still with the Sheriff's office and confirmed that Deputy Jelly . . . .

    Plaintiff's Trial Exhibit # 10.

34. Considering that Lt. Rairden began her IA investigation of Deputy Jelly on November 13, 2008, it is difficult to understand why Lt. Rairden admonished DeJournett on November 18, 2008 that the investigation of Deputy Jelly would come to a conclusion immediately by the end of the day unless she disclosed in writing Yerk's name. See Plaintiff's Trial Exhibit #14. In fact, it was shown to be utterly false when you consider that Lt. Rairden's investigation hadn't even begun. This is so, since it was established at trial that she had yet to interview any of the four LCSO employees that were named in PETA's November 4th letter as witnesses to the suspected animal abuse. *See Id*.

35. The true impetus to Lt. Rairden's insistence and threatening demands that PETA disclose in writing Yerk's name, was the fact that she had scheduled Yerk for an interview the

following day. *See Id*. Further, considering that Yerk had obtained a confidentiality agreement from PETA and had expressed to PETA that he was in fear of reprisal from LCSO, Lt. Rairden anticipated that Yerk, in the interest of saving his career with LCSO, would not disclose his communications with PETA if asked about it in passing. *See Id*.

36. This would allow Lt. Rairden to protect her admitted friend who was the subject of the investigation because if Yerk failed to admit to his communications with PETA, she would then be able to divert the investigation against Jelly into an investigation against Yerk, a person that she had no friendship with and was not politically connected with upper management like Deputy Jelly.

37. On November 19th Lt. Rairden interviewed Yerk as planned. Yerk gave a full account of what he witnessed and no one has ever contested that he was less than forthright regarding any fact material to the subject of the investigation. That said, towards the end of the interview and after being interrogated by Lt. Rairden as to why he had bothered to retain a PBA representative since he was simply a "witness" (as opposed to a "subject" who as function of due process is entitled to notice) in Deputy Jelly's IA investigation, Yerk responded in the negative to Rairden's passively stated question of "haven't spoken to anybody, uh, with PETA?" *See* Defendant's Trial Exhibit L. At that point and as planned, Lt. Rairden immediately initiated an IA investigation against Yerk even though she made no finding that the statement was material to the investigation of whether Deputy Jelly was improperly interacting with his dog. See Plaintiff's Trial Exhibit #14.

38. The facts discussed above and fully developed at trial, clearly establish that Lt. Rairden's investigation was a sham. It is further evident that Lt. Rairden never intended to truly investigate Jelly and that she and LCSO put into play a scheme to intimidate Yerk in

advance of Lt. Rairden's interview so that when the question of whether you spoke to PETA was asked he would say no.

39. This conclusion is not only supported by the trial testimony of Yerk, but also the trial testimony of Mathew Bonsall, a deputy presently employed with LCSO.

40. Deputy Bonsall testified that in the days that preceded Lt. Rairden's interview with Yerk, Lieutenant Moore and Captain Ferrante called him and Yerk into their office to discuss the complaint made against Jelly. At that time it is evident that Captain Ferrante and Moore intended to put Yerk and Bonsall on notice that the department did not tolerate complainants by stating to them that "squeaky wheels" don't get fixed, instead "we destroy them and replace them."

41. At trial Lt. Rairden did not dispute her friendship with Deputy Jelly. She also acknowledged that her husband, who is employed by LCSO as an officer, was considered a friend of Deputy Jelly.

42. Considering the conflict of interest created when an IA investigator who is assigned to investigate their own friend, this fact alone would lead to the natural conclusion that the Deputy Jelly investigation was pretextual.

43. This conclusion was further supported by the fact that Yerk was the only LCSO employee interviewed by Lt. Rairden along with a second IA investigator, who would serve as a witness and would lead the complaint against Yerk.

44. Although Lt. Rairden knew in advance of Yerk's November 19th email that he was in fear of reprisal, had asked for a confidentiality agreement, had failed to disclose his contact with PETA in a meeting with his supervisor, Captain Ferrante, she provide absolutely no basis at trial as to why she refused to provide Yerk a copy of his statement to PETA or

otherwise inform him that they disclosed him as a complainant. Captain Rairden admitted that in "retrospect," her conduct could be considered a violation of the Law Enforcement Bill of Rights and that she herself could be the subject of disciplinary action. This admission was only made after being confronted with the overwhelming evidence that she had a reasonable basis (which she initially denied) to believe that Yerk would not disclose his contact with PETA and therefore he was entitled under the Law Enforcement Officers' Bill of Rights to (amongst other things) notice of the subject of her questioning regarding his contact with PETA.

45. Regardless of the justification for Yerk's non-disclosure, PETA seeks to circumvent their liability by saying that as a matter of law and undisputed fact Yerk is barred from maintaining this action because he cannot benefit from his illegal act of perjury as defined by Fla. Stat. § 837.02.

46. It is important to note that Yerk was never charged with perjury, and that his resignation was not derivative of a criminal act as erroneously alleged by PETA.

47. Rather the testimony at trial provided by Captain Rairden and Lt. Trusal is that at LCSO you lie you lose (which meant termination is imminent), regardless of whether the statement is made under oath. When disciplinary charges were brought against Yerk, they were pursuant to LCSO's disciplinary code, not a criminal statute. This disciplinary code made no mention of whether the statement was made under oath. Thus PETA's reliance on a Fla. Stat. § 837.02, and allegation that the resignation was derivative therefrom, is simply factually incorrect and this statutory violation has only been raised by PETA as an effort to shield themselves from liability.

48. Fla. Stat. § 837.02 has no application to this case since it relates to perjury in "official proceedings," which as noted Yerk's non-disclosure occurred during the course of an illegitimate internal administrative proceeding and therefore cannot serve as a basis for an allegation of perjury. That said, even if the IA investigation was deemed a legitimate official proceeding, pursuant to the referenced statute Yerk would not be guilty of perjury.

49. At the time of the investigation Yerk was not a subject of the "official proceeding" and was simply asked to testify in relation to Deputy Jelly's suspected animal abuse, not his violation of the LCSO's "unwritten code of silence." Captain Rairden and Lt. Trusal acknowledged at trial that there was no evidence that Yerk provided false statements in this regard or otherwise withheld material facts, evidence or the identity of witnesses related to the investigation. Additionally, Captain Rairden acknowledged at trial that the ultimate identification of Yerk as the complainant did not affect in any form her conclusion that Deputy had not abused his dog.

50. If Yerk's non-disclosure involved facts he had witnessed, evidence that he possessed or the name of witnesses, then PETA could properly argue that it was material to the subject of the proceeding. Ultimately though, notwithstanding Captain Rairden's efforts to justify her course of action, Yerk's non-disclosure had no impact on the outcome or course of Deputy Jelly's investigation.

B. <u>Foreseeable Results of PeTA's Breach of the Confidentiality Agreement</u>

51. PeTA then alleges that '[t]here is no legally sufficient evidentiary basis to support the jury's finding of a causal link between PeTA's breach . . . and causation of Yerk's damages." Doc. 255 at pg. 13. Inherent in this assertion is the belief that Mr. Yerk's alleged misrepresentation to LCSO regarding his contact with PeTA was not foreseeable.

52. "Under Florida law, foreseeability is analyzed in a two-step process. First, the court must consider whether a defendant's conduct foreseeably created a 'zone of risk' which poses a general threat of harm to others. Second, the court must consider 'whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred.'" *In re New River Shipyard, Inc.*, 355 B.R. 894, 906 (Bankr. S.D. Fla. 2006) (*citing McCain v. Florida Power Corporation*, 593 So.2d 500 (Fla.1992)).

53. At trial, testimony was provided by Rosemary Wilson and Yerk which established that PETA's employee, Christina Wheeless, was repeatedly and emphatically placed on notice that if it became known that Yerk was a complainant he would be immediately terminated because of the culture of reprisal that existed at LCSO.

54. Christina Wheeless did not dispute Wilson and Yerk's testimony and PETA's very own business records established this fact. Specifically, PETA's initial correspondence to LCSO stated that the callers (referring to Yerk) had asked to remain anonymous for fear of reprisal.

55. This Court has previously ruled on this issue when it stated that " PeTA" promised Yerk anonymity and was on notice that he feared reprisal. *See, e.g.*, Doc 179. A reasonable jury could find that it was reasonably foreseeable to PETA that Yerk would because he felt privileged not to disclose a discussion which he believed was confidential. Because such an intervening cause was reasonably foreseeable, it would not break the chain of causation and absolve PETA of liability. *See, e.g., Dep't of Transp. v. Anglin,* 502 So. 2D 896, 898 (Fla. 1987).

56. Not only has this Court viewed Yerk's lie and resulting resignation as reasonably foreseeable on multiple occasions, but the same conclusion was unanimously drawn by

an 8 person jury. The question of proximate cause is "generally for juries to decide using their common sense upon appropriate instructions, although occasionally, when reasonable people cannot differ, the issue has been said to be one of law for the court." *Stahl v. Metro. Dade Cnty.*, 438 So. 2d 14, 21 (Fla. 3d DCA 1983). Considering that 9 separate people (one of which is this well reasoned Court) have concluded that the results of PeTA's breach were foreseeable, it is unimaginable how PETA can fairly contend that "reasonable people" cannot foresee what occurred.

57. The whole basis for a confidentiality agreement is to maintain anonymity. Once they breached the confidentiality agreement, PETA absolutely knew that Yerk was going to be confronted by his employer about the matter and that he would likely not be forthcoming because he had advised them that he would be terminated if they learned of his association with the complaint. As noted, the fact that the statement was made under oath was not the reason Yerk's career was prematurely terminated. It was simply that he was not forthright to his employer and that not surprisingly, his employer immediately chose to initiate actions thereafter to terminate him.

58. PeTA's practice is to impose pressure upon organizations and it is undeniable that they can appreciate that employers will not react positively to PETA complaints against them that are initiate by employees. Testimony was obtained at trial from various PeTA employees which established that the promise of anonymity is a necessary function because of the volume of callers that fear reprisal from their employers. It can be fairly stated that the most foreseeable form of reprisal is being confronted with the complaint and being disciplined for not being forthcoming regarding the complaint and seeking assistance from a third parties (as occurred in this case).

59. Yerk's resignation was a mere formality as testified to by Lt. Trusal and Captain Rairden, since employees at LCSO are immediately terminated if they lie to a supervisor, irrespective of whether the statement is made under oath or constitutes perjury. This would not be out of place in many organizations and can be fairly anticipated by reasonable persons.

60. It is common practice that employees who are confronted with inevitable termination will resign in an effort to mitigate the consequences/stigma associated with an official termination. This is seen in such public examples as the President's cabinet members, coaches in professional sports, CEOs of large corporations, etc.

61. Since Yerk's misrepresentation and resulting termination are clearly foreseeable, a preemptive resignation also naturally flows from the breach and therefore is reasonable foreseeable.

IV.   *The Confidentiality Agreement Does Not Violate Public Policy*

62. Finally, PeTA seeks to overturn the jury's verdict on the grounds that the confidentiality agreement established to exist between the parties is *void ab initio* as it violates public policy.

63. The Court has already ruled on this claim in its November 4, 2011 order which stated that:

> In this case, the confidentiality agreement allowed PETA to disclose the substance of the alleged abuse and the identity of the witnesses to it. The agreement only precluded the disclosure of the identity of PETA's source. While it seems clear that the confidentiality agreement did not and could not create an absolute privilege, and would eventually give way to lawful procedures which could compel disclosure of the source's identity, that stage had not arrived in this case. At the time of the disclosure in this case, PETA was not legally required to answer questions from the LCSO. Given

> the "extreme caution" the Court must use before declaring a transaction void as contrary to public policy, the Court cannot find that the agreement in this case clearly affected "some great prejudice to the dominant public interest sufficient to overthrow the fundamental public policy of the right to freedom of contract." Accordingly, the Court finds that the agreement is not unenforceable as a violation of Florida public policy.

Doc. 179 at pgs. 14-15 (internal citations omitted).

64. There was no evidence elicited at trial by the Defendant which would require the Court to revisit its prior ruling. In fact, the evidence at trial supports the Court's ruling since it was established through the trial testimony that PeTA chose to breach the confidentiality agreement as a function of its own free will. Moreover and as discussed, there was no evidence that the subject confidentiality agreement precluded LCSO from speaking to all known witnesses or otherwise gathering information relevant to the claim.

65. The Defendant again attempts to use the testimony from Capt. Rairden to establish several issues which it believes are important to the Court's determination on this issue. As stated above, the testimony of Capt. Rairden was not "uncontradicted and unimpeached," nor was it offered by a "disinterested witness." It must be disregarded as a matter of law when adjudicating the subject motion.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court enter an order denying the Defendant's renewed rule 50 motion for judgment as a matter of law, and grant such other relief as the Court deems just and proper under the circumstances.

*Tardif a/t/f Yerk v. PeTA*
Civil Action No.:2:09-cv-00537-JES-SPC
Page 20 of 20

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that true and correct copy of the foregoing was served via CM/ECF on March 20, 2012 which will provide notice to counsel of record.

      /s/ Jose P. Font, Esq.
Jose P. Font, Esq.
Florida Bar No.: 738719
Vernis & Bowling of Broward, P.A.
5821 Hollywood Blvd., First Floor
Hollywood, FL 33021
(954) 927-5330; (954) 927-5320 (fax)